151 So.2d 613

Byron **HAIR**

v.

**W. H. BEALL.**

4 Div. 145.

Supreme Court of Alabama.

March 14, 1963.

Rehearing Denied April 11, 1963.

Griffin Sikes and W. H. Baldwin, Andalusia, for appellant.

Joe C. Cassady, Enterprise, for appellee.

HARWOOD, Justice.

In the proceedings below the appellant, Byron Hair, filed a bill asserting that he

and the appellee, W. H. Beall, were partners in the Andalusia Tire Company, Hair owning a one-third interest, and Beall a two-thirds interest in said firm.

The bill sought a dissolution of the partnership and a distribution of the assets of the partnership as the respective interests might appear.

Beall filed a demurrer to the bill and an answer. The demurrer was overruled. The answer denied the existence of a partnership, and before trial Beall also filed a cross bill seeking monies from Hair. Upon the demurrer to the cross bill being overruled, Hair filed an answer to the cross bill.

Essentially the pleadings and evidence raise the question of the existence of a partnership, and accounting.

Upon conclusion of the hearing the chancellor entered a decree finding there was no partnership between Hair and Beall as alleged in the original bill, that all disputed issues were found in Beall's favor, and denying to Hair the relief prayed for in his bill.

From that judgment and decree Hair has perfected this appeal.

The evidence presented by the appellant, Hair, in the hearing below consists largely of Mr. Hair's testimony and certain documentary exhibits.

Mr. Hair testified that he had lived in Andalusia his entire life and in 1950 was operating a filling station and garage, with which connected a bus station, he selling bus tickets.

The appellee, Beall, in 1950 had moved back to Andalusia. The appellant, and his family, and Beall had been friends for a number of years.

Beall indicated to Hair he was interested in going into business with some young man, and after some investigation, they opened up the Andalusia Tire Company.

Hair testified that under their oral agreement he was to operate and conduct the business, and receive 50% of the profits for his work, and Beall was to put up the money and keep the books. Beall did put up around $13,000 to begin the business. During the first year it became apparent that more capital was required, and Beall put additional capital in the business. Because of the additional capital, it was agreed between Hair and Beall that they would share the profits on a one-third, two-thirds basis, Beall receiving the two-thirds portion.

Hair further testified that he was to be liable for his portion of whatever losses might result from the operation of the business. In this connection he testified that he owned no assets other than his home, which it developed was in his wife's name. However Hair contended he could have paid his portion of any losses incurred by the business by calling on his family connections and friends.

Hair further testified that from the beginning of the business, sales tax reports, and income tax reports, were filed as a partnership operation and no social security or income tax payments were withheld on his income from the operation.

In 1954, Beall and Hair took a third person, Mr. L. R. Deal, into the business, and a written partnership agreement was executed. Under the terms of the agreement the capital of the partnership was fixed at $50,000, of which Beall was to contribute $30,000 and Hair and Deal $10,000 each. Profits and losses were to be distributed or processed on the above basis.

It is to be noted that this partnership agreement executed on 14 August 1954, by Beall, Hair, and Deal, contains the following significant statements in paragraph 13 thereof:

"It is hereby expressly understood and agreed that W. H. Beall, one of the partners to this business, has previously owned and operated this business

individually under the name of the Andalusia Tire Company.

\*   \*   \*   \*   \*   \*

"It is hereby expressly understood and agreed that among the assets of the Andalusia Tire Company formerly owned by W. H. Beall and transferred to the partnership herein created is the good will of the Andalusia Tire Company as owned and operated by W. H. Beall, individually."

It appears that Hair paid his $10,000 into the partnership by transferring $5,000 of his accumulated profits in the Andalusia Tire Company to the partnership and by borrowing $5,000 from Beall, and giving notes therefor. These notes were later paid out of profits of the business.

The partnership arrangement did not prove satisfactory because Mr. Deal's other business interests did not permit him to devote sufficient time to the Andalusia Tire Company, and after about a year the partnership was dissolved by oral mutual agreement.

Upon dissolution of the partnership, Hair testified that he and Beall "just went back to the arrangement" they had before Deal came into the business.

It was part of appellant's duties to take inventories of the business.

On his direct examination the appellant testified that in 1957 he "stuffed" the inventory as to the number of tires in the warehouse.

Upon discovery by Beall of the discrepancy in the inventory, he signed a letter which he claimed was written by Beall, and according to Hair: "The only thing we discussed with reference to this letter, I said that I would sign the letter and continue on in the partnership agreement that we had been operating under, that the business would go right on and I would do a better job of it, or as good a job."

The letter above referred to reads as follows:

"Sept. 10th, 1957

"Dear Mr. Beall:

"I wish to acknowledge that I stuffed the inventory last week in a number of places. I also wish to acknowledge making false statements to you. I do so for the reason that I was envious of you and the money, and because I was upset over making less money than you. I wish to say here that I am very sorry for this and I ask your forgiveness.

"Sincerely,
"(signature)
"Byron Hair"

Hair denied he was fired by Beall at this time, and further denied that he, or his wife, had begged Beall to take him back after the false inventory incident.

He also testified that when he left the business in September 1960, his capital account in the business amounted to $15,000 and that the figures on the last return that was made up in closing out the partnership "showed his capital account to be $6,900 and he was sure this figure took in all adjustments that could have been made."

On cross examination Hair testified that his "stuffing" of the inventory in 1957 was a deliberate act to increase his share of the profits, and under the conditions, was a deceit and a fraud.

The appellee, Beall, testified that he had been in the banking business all of his adult life and at the time of the trial was 63 years of age. He had been connected with, or had organized banks in Alabama and Florida, and from 1933 to 1946 had lived in Andalusia, and then had moved to Enterprise where he had lived until 1950. In 1950, he apparently sold the bank he had organized in Enterprise, and after spending several months in Florida, decided to return to Andalusia to live, and did return in May 1950.

Upon his return to Andalusia, and not being in any business, he would on occasions drop in the bus station and "chew the rag" with Hair, whom he had known since 1933. He was also on friendly relations with the family of Mrs. Hair.

On one of these visits Hair told Beall how hard up he was, that he was not making expenses, and owed debts all over town. He requested Beall's help in finding a job, or in getting into something out of which he could make a living. Upon telling his wife of the conversation, she urged him to help Hair. After investigation he decided that the tire and recapping business was a good prospect, and told Hair he would help him get into such business. Upon talking with a tire equipment representative he was told that a tire and recapping business would have to have about $9,000 worth of equipment, and an additional $3,000 or $4,000. He told the equipment salesman to go on and ship the equipment and he would lend Hair $4,000 to start the business.

Upon further investigation Beall determined that the tire and recapping business was a large business, and would require more than $13,000 to be on a really profitable basis. He then talked to Hair again, and according to Beall:

"I said I'll put up the money and put you in the tire business in a big way; I'll stay and help you for a time until you get to know enough about the business to manage it, and I will give you one-third of the profits, and you are to save your money and buy the business and own it yourself.

"Q But the business was yours?

"A That's right. •

"Q No partnership of any description?

"A No partnership at all, and with the absolute understanding that he was going to save his money and buy the business, because I had no idea of go-ing into the tire business for myself at that time.

"Q You had no agreement with him at any time, at the organization of the business, or at any other time that you and he would share fifty-fifty in the profits and losses?

"A Why, no, sir.

"Q You were the sole proprietor of this business at all times, except this partnership agreement you had for one year in which Mr. Deal and Mr. Hair were involved?

"A That's right.

"Q How much money did you invest in this business within the first year or two?

"A I put about $40,000.00 in it. Maybe less than that to begin with, but as the business needed it I added to it until it got up to about $100,000.00.

"Q This was money of yours that you had already accumulated?

"A Oh, yes, it was my money.

"Q Did Mr. Hair put any money in it?

"A Not a penny.

"Q Was Mr. Hair in any way responsible for any operating losses of that business?

"A He had nothing but debts. He wasn't worth anything. In other words, I let him have some money to pay some debts with."

Beall further testified that Hair lacked executive ability in operating the business, particularly in the matter of extending credit. For this reason, he brought Deal into the business in 1954 and a partnership was formed. Upon this partnership being dissolved by mutual agreement, he bought Deal out, and he and Hair resumed their former arrangement though it became apparent that Hair was not going to save

any money with which to buy the business. During the ten years Hair drew some $104,000 as his part of the profits.

Upon detecting the false inventory in 1957, Beall called Hair in and told him they were through, "that just wound me and him up." Hair thereupon left and Beall went to his office.

According to the testimony of Beall:

"And then in a little while Byron and his wife came down there pleading with me to give him another chance, that if I kicked him out and put him out in that manner that they would be disgraced and that he would be ruined and he couldn't get another job, and would I give him another chance. And I said, for the sake of you and the children I will; my better judgment tells me not to do it, but I will give him another chance. So I started out with him again, and of course wound up that way."

Upon resumption of the business arrangement, Hair worked satisfactorily until about 1959, when he seemed to lose interest in the business and neglected it.

In April 1960 an inventory was made to determine the condition of the business. Beall testified that Hair counted the tires and put a valuation on them and he wrote down the figures that Hair would call off to him. After the inventory it was determined that the business had approximately $16,000 in profits for the preceding six months. Hair was dissatisfied with his share of the profits and stated that he would have to get something else to do. Beall told him he wished he could do something about the matter so that he, Beall, could get out of the business. Hair left with the understanding that Beall would determine the cost of liquidating the accounts, what losses there might be, as well as adjustments on tires already sold, but which might prove defective.

After Hair left a customer came in and wanted a particular size and type of tire, and Beall overheard the salesman tell the customer they didn't have such a tire. Upon further inquiry as to why such tires had not been recapped, he was informed that there were no casings of that type in the warehouse that were recappable. Thereafter, Beall had the Armstrong Tire Company send in some men to inventory the casings in the warehouse. Many of the casings which Hair had valued at $3.50 proved worthless, and the stock was inventoried at $2,330 as compared with the inventory value of $5,789.50 set by Hair.

Beall further testified that these worthless tires had been stored in the warehouse for as long as two years and were included in prior inventories. Beall testified that he did not know the value of used tire casings, but that Hair did.

H. C. Cunningham testified that he formerly had been employed by Mr. Beall at the Andalusia Tire Company from 1953 to 1956 and again for a period of several months in 1960. He knew that Mr. Beall owned the business. In 1960 there were casings in the warehouse that were practically worthless which he would not accept.

Mr. R. F. Warren testified that he was bookkeeper for the Andalusia Tire Company for two or three years around 1954, 1955, and 1956. Hair worked there during this time, and it was his knowledge and understanding that the business was owned by Beall.

Edward Cobb testified that he had been employed at the Andalusia Tire Company from 1950 to 1956; that during his employment Hair had told him on a number of occasions that he owned no part of the Andalusia Tire Company but that the business was owned by Mr. Beall; that Mr. Beall had started the business, and that he, Hair, was to buy the business out.

Graydon Stanley testified that he did some accounting and tax work in Andalusia and had filed the first tax return for the Andalusia Tire Company. In preparing this return it was explained to him that

W. H. Beall owned the business individually and that Byron Hair was receiving one-third of the net profits. Hair told Mr. Stanley that he did not own any part of the business. In the course of preparing the tax return, he reviewed the books and for convenience filed a partnership return for the Andalusia Tire Company. Mr. Hair told him that the business was established for him by Beall and he was to buy the business from Beall.

It was at Stanley's advice that the partnership form was used in the tax returns which were prepared by Mr. Stanley for some five years after the business was started.

Harvey Lee Rabren testified that he had examined the books of the Andalusia Tire Company after Hair had left the business. These books showed that no reserves had ever been set up, and he did create a tire adjustment reserve based on a letter from the Wilbanks Tire Company, and he also created a reserve for bad debts which was fantastically low. The tire adjustment reserve was set up only for the year of 1960, and was fixed at some $12,000. Mr. Rabren testified that after making the adjustments and the tire adjustment for the year 1960, his examination showed that Byron Hair had $2,097.47 owing to him from the business. He made no tire adjustments other than for the last year as he had no basis to go on.

Mr. Rabren further testified that the books of the Andalusia Tire Company showed that for the period 1950 to 1953, the gross profit averaged 37%, in 1954, 1955, and 1956, the gross profit averaged 45%, and 1957 through 1960, the gross profit averaged 38%. Under accounting theories, the increase in the average gross profit during the 1954, 1955, and 1956 years would result from either an increase in prices, or an inflated inventory at the end of any accounting year.

In rebuttal for Hair, Mrs. Hair testified that she had never begged or entreated Beall not to break up the business arrangement at the time of the inventory stuffing incident.

We are not here concerned with the rights of a third person who has dealt with parties associated in business, wherein the law may declare a partnership has arisen by estoppel without inquiry into the intent of the business associates. See Couch v. Woodruff, 63 Ala. 466. This case presents a dispute between the associates themselves as to the existence of a partnership inter sese. This must be determined by the intent of the parties as is expressed, or may be gathered from their agreement as evidenced by the agreement and surrounding circumstances. Dicks v. McAllister, 20 Ala.App. 5, 100 So. 631.

Under Hair's testimony a partnership was formed between him and Beall in 1950. Under Beall's testimony there was never any intention between the two to form a partnership, but an arrangement was entered into whereby Beall, because of friendship for Hair and his family, set up Hair in business with the understanding that Hair was to receive one-third of the profits for his services, and was to buy the business from Beall.

Supportive of Beall's contentions was the evidence that every penny of outside money that was put in the business was furnished by Beall, though Hair was to contribute his services; title to the machinery and equipment, to the tires purchased, and the lease were all in Beall's name; in the advertisements run by the Andalusia Tire Company, Hair was listed as "Manager"; the witness Graydon Stanley, who prepared the tax returns in the first five years of the business, testified that Hair told him that the business was owned by Beall, with the right in Hair to purchase it. Stanley further testified that the returns were filed as a partnership return upon his advice and as a matter of convenience. The written partnership agreement between Beall, Hair and Deal, executed in 1954, states that the Andalusia Tire Company had theretofore been owned by Beall individually, though Hair contended

at the trial that a partnership existed between him and Beall from the inception of the business in 1950.

■■ All of the above tends to amply support the conclusions of the chancellor that no partnership inter sese existed between Beall and Hair. Further, the evidence was heard ore tenus in the court below. While there was an irreconcilable conflict between the evidence of the respective parties, the finding of the trial judge had the effect of a jury verdict, and every presumption will be indulged in favor of the decree, and it will not be disturbed unless palpably wrong. Fidelity Service Insurance Co. v. Legg & Sons Burial Ins. Co., Ala., 145 So.2d 811, and cases therein cited.

In his decree the chancellor further found that Hair had received all from Beall that he was entitled to and that the court was unable to find that Beall was indebted to Hair in any sum whatsoever.

■ There was evidence before the chancellor tending to support this conclusion. Further, the action of the court in denying Hair relief would have been justified in light of Hair's admitted "stuffing" of the inventory in 1957, and the further evidence tending to raise a reasonable inference that Hair had given value to worthless tires in the 1960 inventory. One who comes into equity must do so with clean hands, and equity will not aid one in extricating himself from hurtful consequences when his acts are reprehensible and directly connected with the subject matter of the litigation.

It appears that originally a hearing was had on Hair's petition before the Hon. F. M. Smith, Judge of the Circuit Court of Covington County, and that at the conclusion of said hearing a decree was entered in favor of Hair on 19 October 1961. It further appears that upon Beall's application for rehearing, Judge Smith granted the same on 8 December 1961, which order was accompanied by an "Order of Recusal," by which Judge Smith recused himself from sitting further in the proceedings. Thereafter the Hon. Walter B. Jones, Judge of the Montgomery County Circuit Court was assigned by the Chief Justice of Alabama to try the case.

Appellant's assignment of error No. 1, alleges error on the part of Judge Smith in setting aside the decree entered by him, and ordering a new trial.

The record does not disclose that any appeal was ever perfected from Judge Smith's order setting aside his decree. The record in this case, as shown by the Citation on Appeal, and the Certificate of Appeal, and the Security for Costs, all refer only to the decree rendered on 28 March 1962, the date on which Judge Jones rendered his decree.

It follows that nothing is presented in this appeal in reference to the decree of Judge Smith granting the application for rehearing and setting aside the decree entered by him.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.