This is an appeal by Ernest Waters from final judgments returned in favor of Carl Ryals and the Union Bank of Repton (Bank). We affirm.
On April 17, 1977 Ernest Waters brought an action against the Bank and Ryals. He claimed damages from Ryals for work and labor done, for libel in publishing untrue statements that Waters was in default on his indebtedness to the Bank, and for fraud in inducing Waters to become indebted to the Bank. He claimed damages from the Bank for libel resulting from its agent Ryals' publication of untruths concerning Waters' default on the indebtedness to the Bank.
On May 18, 1977 the Bank filed a statutory detinue action against Waters for possession of a mobile home which was listed as collateral on Waters' promissory note at the Bank. Waters answered the detinue complaint and counterclaimed against the Bank for libel (which he had also claimed as a part of his earlier action). In the Bank's action Waters also filed a third-party complaint by adding a count averring a partnership between himself and Ryals, and demanding an accounting and judgment against Ryals for his share of the profits arising from an alleged farm equipment and cattle partnership.
The actions were consolidated for trial. Ryals was substituted for the Bank as plaintiff in the second action because he had paid the indebtedness sued on and taken an assignment of the note involved.
After hearing the evidence ore tenus the trial court found that Waters was not entitled to recover from the Bank and Ryals in his action, and found for Ryals as third party defendant and against Waters as third party plaintiff in the second action. Waters' motion for a new trial was denied. This appeal followed.
The relationship between Waters, Ryals and the Bank began in 1971 while Waters was doing part-time collection work for the Bank and when Waters contended that he and Ryals became partners to buy and sell used farm equipment. According to Waters, Ryals was to find interested purchasers through his work at the Bank and Waters was to find, purchase, and repair the needed farm equipment through financing by the Bank. The equipment would be sold by Waters in his name and the purchaser would finance the transaction through Ryals and the Bank. The purchaser would pay his loan to Waters who would deposit the entire amount, including profits, in the Bank. Waters contended that the profits and losses were to be divided equally and that he never received any money. Ryals denied the existence of any *Page 959 
partnership and maintained that money received from these sales was either deposited in Waters' personal checking account or credited against one of Waters' bank notes. These farm equipment transactions allegedly continued until 1973.
In the early part of 1973 Ryals sold some cattle to a Mrs. Watson. After this sale Waters contended that he and Ryals entered into a partnership to buy and sell cattle under which Ryals was to furnish the pasture land, supplies, the money, maintain the partnership books, and file the tax returns; Waters was to raise and sell the cattle. According to Waters the cattle transactions which did occur were conducted in a manner similar to the farm equipment sales. Again, Ryals denied any partnership in the cattle business.
During the period of these cattle transactions, approximately the next three years, Waters was allowed virtually unlimited credit by the Bank. He was permitted to overdraw his personal checking account in substantial amounts and was also authorized to draw checks on Ryals' personal checking account. Ryals contended that the overdrafts were allowed as a personal favor to Waters and that he personally guaranteed one of the notes to avoid problems with banking examiners and with the Bank for overextension of credit on deficient security. He felt that he had made a poor decision and did not intend to allow the Bank to lose money as a result of it.
In January, 1974 Waters purchased a used mobile home which he placed on a foundation on land owned by his parents. A curtain wall was placed around the base, straps were cemented down, cement porches were poured, and a carport was attached. On January 25, 1974 Waters executed a promissory note for $5,550.71 due January 25, 1975, payable to the Bank, with the mobile home listed as collateral. The Bank took a written security agreement covering the mobile home and filed a financing statement. An additional loan of $1,205.85 was made on the mobile home note on March 27, 1974, and was due January 25, 1975. On July 31, 1975 Waters obtained from his parents a deed to the land on which the mobile home had been placed. This deed was not filed in the probate judge's office until May 26, 1978.
Whether this note was satisfied was also disputed. Ryals and the Bank contended that it was not paid off but only renewed, and that subsequently this note was consolidated with other renewed notes into one note, a "big note." Waters contended that all of the payments he periodically made to the Bank were understood by Ryals to be applied to the mobile home indebtedness and, accordingly, that debt was satisfied.
On September 6, 1975 Waters signed a promissory note and security agreement for $29,602.42 payable to the Bank, due March 6, 1976. This note, the "big note," combined and renewed all Waters' unpaid notes held by the Bank, including notes in his name used to provide the money to purchase the alleged partnership cattle, notes to cover overdrafts for personal expenses and, according to Ryals and the Bank, the renewed note on the mobile home. Waters contended that this "big note" was blank when he signed it, and that it was understood between himself and Ryals that the collateral was to be the alleged partnership cattle and a truck owned by Waters. The note and security agreement actually listed the truck, some of the cattle, and Waters' mobile home as collateral. Waters claimed that when he was shown a copy of the note some time later he protested the inclusion of his mobile home as collateral.
On March 8, 1976 Waters executed a renewal note for $31,119.32 due September 6, 1976 renewing the "big note" of September 6, 1975. On November 1, 1976 he executed another note for $26,102.54, payable on May 6, 1977, renewing the note of March 8, 1976. He contended that both of these notes were blank when signed. Ryals disputed that contention.
Shortly after the second renewal Waters contended he asked Ryals to settle up on the partnerships giving Waters his share of the profits. Then, during the first week of December, 1976, the Bank declared the note due and payable and foreclosed on its security *Page 960 
agreement by taking possession of the cattle listed as collateral on the renewed "big note" under a provision of the note agreement allowing such an action if the collateral became unsatisfactory to the Bank. The Bank claimed the collateral unsatisfactory because Waters was letting the cattle die of starvation.
Waters has asserted two issues on this appeal. First, he argues that the trial court committed reversible error in ruling in favor of Ryals on the third-party complaint filed by Waters alleging a partnership and requesting an accounting. He contends that such a finding is against the preponderance of the evidence and it palpably wrong and manifestly unjust. We find, however, that the trial court's verdict is supported by credible evidence.
A partnership is "an association of two or more persons to carry on as co-owners a business for profit." Code of Ala. 1975, § 10-8-2 (7).
A partnership arises only from an express or implied agreement among the parties and is never established by implication or operation of law, at least in the situation where the dispute concerning the existence of a partnership is between the parties. Cox v. Fielding, 24 Ala. App. 68,130 So. 164 (1930). The surrounding circumstances as well as any express agreement between the parties may evidence the intention of the parties necessary to establish such a relationship. Hair v. Beall, 274 Ala. 699, 151 So.2d 613
(1963).
The evidence in this case was greatly disputed. The trial court heard all the evidence, examined the exhibits offered, and observed the demeanor of the witnesses. It decided under the circumstances surrounding these business transactions that it was not the intention of Waters and Ryals to act as a partnership. From an examination of the entire record we must conclude that the evidence supports that conclusion, and consequently there was no basis provided for a partnership accounting. There was no evidence of any written partnership agreement or a partnership bank account, and no sales in a partnership name. Cattle were bought and sold by both parties each in his own name. All the farm equipment was bought and sold in Waters' name alone. Expenses in the cattle raising operation were always incurred in the parties' individual names. Profits from these business transactions were not divided between the parties. All of the money made on the sales was either deposited in Waters' personal account at the Bank or credited against debts he owed that Bank. None of the notes Waters signed to obtain the money to purchase the used farm equipment and cattle was signed by Ryals. There was evidence that Ryals voluntarily became personally liable to the Bank on one of Waters' notes to avoid potential problems with bank officials and examiners because he had overextended credit to Waters on deficient security. The trial court's decision in a case heard ore tenus will be affirmed if it is "fairly supported by credible evidence under any reasonable aspect, and is not palpably wrong or manifestly unjust." Whitt v.McConnell, Ala., 360 So.2d 336, 337 (1978).
Waters also contended that the trial court committed reversible error by ruling that Ryals held a valid and enforceable security interest in Waters' mobile home under a written security transferred to him by the Bank and that Ryals was entitled either to its possession or to a judgment for its value. Waters argues that the mobile home was attached to the realty before the Bank made any loan listing the mobile home as collateral, and therefore the mobile home could not be the subject of a security interest under the Uniform Commercial Code. Once the mobile home was attached to the realty as a fixture and he and his wife moved into it, he argues, the mobile home became subject to his wife's homestead rights and he did not then have the power to encumber it without the voluntary assent and signature of his wife as required by Code of Ala. 1975, § 6-10-3.
We hold that both of these arguments are without merit. The first because of the fact that in this case whether the security agreement attached before or after *Page 961 
the "mobile home" became a fixture is irrelevant. See § 7-9-313 (3). This follows from the fact that between debtor and creditor, a security agreement is effective according to its terms under § 7-9-201, if the provisions of § 7-9-203 and § 7-9-204 are met.
Section 7-9-203 provides in pertinent part that:
 [A] security interest is not enforceable against the debtor or third parties unless:
 (a) The collateral is in the possession of the secured party; or
 (b) The debtor has signed a security agreement which contains a description of the collateral. . . .
Section 7-9-204 provides in pertinent part:
 (1) A security interest cannot attach until there is agreement (subsection (3) of section 7-1-201) that it attach and value is given and the debtor has rights in the collateral. . . .
It was of importance to the Bank that it have a valid Article 9 security interest, not to establish priority against another creditor, but to gain the preferred creditor status and extra-judicial remedies that the Alabama U.C.C. confers. See §7-9-501. Without the Article 9 security interest the creditor would be limited to pre-Alabama U.C.C. law which placed, not creditors, but debtors in the favored position. Cf. ClarkEquipment Co. v. Armstrong Equipment Co., 431 F.2d 54 (5th Cir. 1970). From the record we find that a valid Article 9 security interest was obtained by the Bank in the mobile home and hold that such interest was enforceable. § 7-9-203.
Waters' homestead argument likewise is untenable. He asserts that when he and his wife moved into the mobile home after attaching it to the realty it became their homestead and thus he could not encumber it without the assent and signature of his wife.
A homestead exemption is allowed every resident of the state with the improvements and appurtenances thereon, not to exceed $2,000.00 in value and 160 acres in area. Code of Ala. 1975, §6-10-2. Such liens, however, are not affected by this exemption. Code of Ala. 1975, § 6-10-4 provides:
 The provisions of this article shall not, however, be so construed as to prevent any lien attaching to the homestead in favor of any laborer, merchant or materialman for work and labor done or for materials furnished, or in favor of any vendor for unpaid purchase money or so as to affect any deed, mortgage or lien on such homestead, lawfully executed or created.
Accordingly, even assuming that homestead rights were created by Waters' occupancy of the mobile home on the land, they would not have prevailed against the vendor's lien. Cf. Martin v.First National Bank of Opelika, 279 Ala. 303, 184 So.2d 815
(1966); Cates v. White, 252 Ala. 422, 41 So.2d 401 (1949).
There being no reversible error, the trial court's judgment must be, and is, affirmed.
AFFIRMED.
All the Justices concur.