INGRAM, Justice.
The plaintiff, Gus M. Vergos, appeals from a judgment in favor of Waterman Building Partnership and the members of the partnership, Robert L. Dubofsky, Jesse R. Gottlieb, R & L Levin Associates, Leonard Levin, Richard Levin, Philip M. Blu-menfeld, and James Buslik (hereinafter collectively referred to as “Waterman” or “the partnership”).
The two issues before us are: 1) whether the trial court erred in enforcing the agreement between Vergos and the partnership and holding that Vergos is a member of the partnership; and 2) whether the trial court erred in holding that a $500,000 promissory note made by Waterman is a nonrecourse note.
Vergos sued Waterman, seeking a declaration that he is not a member of the partnership and seeking payment of a $500,000 promissory note made by the partnership.[1] He also sued Kenneth Montgomery for damages for fraud. Waterman counterclaimed, seeking specific performance of an agreement under which Ver-gos was to transfer the promissory note to the partnership in exchange for a 50 percent share of the partnership.
After a nonjury trial in which evidence was presented ore tenus, the trial court entered a judgment for Waterman, holding that Vergos is a member of the partnership and ordering him to transfer the promissory note to the partnership. The trial court also held that a promissory note made by Waterman to Gilbert Leasing Company was a nonrecourse note. The trial court made the judgment final pursuant to Rule 54(b), A.R.Civ.P., leaving Vergos’s fraud claim against Montgomery pending.
Because this case was tried to the court without a jury and the evidence was presented ore tenus, and because, with few exceptions, neither party challenges the trial court’s findings of fact, we adopt those findings, which read as follows:
“1. The Plaintiff, Gus M. Vergos (hereinafter sometimes referred to as ‘Vergos’) filed suit on or about September 7, 1990, against the Waterman Building Partnership, its individual partners, Robert L. Dubofsky, Jesse R. Gottlieb, R & L Levin Associates (Leonard Levin, Richard Levin), Philip M. Blumenfeld, and James Buslik (hereinafter referred to collectively as ‘Waterman’) and against Kenneth Montgomery, Triple Crown Realty, Inc. (hereinafter referred to as ‘Montgomery’), and against Gilbert Leasing Company, Inc., and M. Vann Bush, an officer thereof (hereinafter referred to as ‘Gilbert’) (summary judgment was previously granted in favor of M. Vann Bush on all applicable causes of action).
“2. In April 1986, Gilbert was the owner of a commercial office building located in Mobile, Alabama, known as the ‘Waterman Building’ or SouthTrust Bank Building (hereinafter referred to as the ‘Building’).
“3. On or about April 2, 1986, Gilbert received a written Offer to Purchase from Montgomery for the Building.... The purchase price was $2.9 million, of which Gilbert was to receive $2.4 million in cash at closing. The remaining $500,-000.00 of the purchase price was to be evidenced by a promissory note and second mortgage from the buyer to Gilbert. The written Offer to Purchase expressly stated that this $500,000.00 promissory note and second mortgage would contain ‘no personal liability’ by the maker of the note to Gilbert. The Offer to Purchase, *385 with respect to this $500,000.00 obligation to Gilbert, contemplated what is commonly referred to as a ‘nonrecourse’ or ‘exculpatory’ note and mortgage from the purchaser. An exculpatory or nonre-course note is one which the holder’s only recourse in the event of a default is to foreclose upon the real property securing such note.
“4. The April 2, 1986, Offer to Purchase from Montgomery to Gilbert was subsequently assigned by Montgomery to Waterman, an Alabama general partnership formed to acquire the Building (in which Montgomery was a partner). The first Partnership Agreement for Waterman was executed .on July 2, 1986_ However, lacking the availability of two minority interest partners for execution of the Agreement,, a subsequent Partnership Agreement was prepared and executed on July 3, 1986.... This Agreement was silent with’ respect to the authority to admit new partners, and contained general language that the Agreement could not be amended except in writing signed by all partners.
“5. On or about July 2, 1986, the sale of the Building from Gilbert to Waterman was closed. The closing occurred simultaneously in both Mobile, Alabama, and New York, New York. Loan documents, including a first mortgage, in the amount of $2.2 million from Chase Manhattan Bank, were executed by the partners in New York. A vendor’s lien deed and $500,000.00 promissory note to Gilbert ...' were executed in Mobile for the Partnership by Montgomery, who at that time was a member of Waterman and was acting with its authority.
“6. The evidence is undisputed that both Gilbert and Waterman intended not to create any personal liability for either the Partnership or the individual partners with respect to the $500,000.00 note to Gilbert and the vendor’s lien deed to Gilbert. The parties testified that this was their intent, as evidenced in the April 2,1986, Offer to Purchase, and that this did not change to [sic] the time of closing or thereafter.
“7. Joseph P. Jones, a Mobile attorney, represented the Partnership at the Mobile portion of the closing, and prepared the promissory note evidencing the $500,000.00 obligation to Gilbert ..., which contained the following ‘nonre-course’ provision:
“ ‘Upon the occurrence of an event of default as specified elsewhere herein, or in the vendor’s lien deed, the lender shall take possession of the real property together with any improvements thereon, and the borrower shall be released from any further obligations or liability pursuant to this note.’ (Emphasis added.)
“However, the evidence is undisputed that at closing Gilbert, concerned that the word ‘shall’ in the above provision might create an absolute requirement that Gilbert retake possession of a building it did not wish to own, requested that the word ‘shall’ be changed to the word ‘may’ so that Gilbert would not be required to take the building back. The evidence is undisputed that the requested change was not intended by either Gilbert or Waterman to affect the personal liability aspect of the promissory note, and was intended only to modify the rights and obligations of Gilbert, and not Waterman. The evidence is without dispute that Gilbert always understood that its only remedy following a default under the promissory note and vendor’s lien deed would be to foreclose upon the property, and that there was no remedy of suing Waterman for the obligation or a deficiency. At closing, the word ‘shall’ was changed to the word ‘may’ by agreement between Gilbert and Waterman.
“8. Montgomery [who had a 25% share of the partnership] sold 15% of ... the Partnership to the other partners in July 1987. An agreement between Montgomery and the Partnership executed at that time provided further for dilution of his remaining 15% [sic, 10%] Partnership interest" in the event that certain capital contributions were not met....
“9. Some time in June or July 1988, Montgomery and Vergos began negotiating a purchase of the $500,000.00 promis *386 sory note from Waterman to Gilbert, from Gilbert. Montgomery proposed to Vergos that they acquire the note for $300,000.00 and that they begin foreclosure proceedings on the note to put pressure on Waterman to pay the obligation. In the event Waterman did not pay the obligation, the plan was to follow through with foreclosure and gain possession of the Building, and either sell the Building or refinance the first mortgage and operate the Building.
“10. Both Montgomery and Vergos knew that the $500,000.00 note was in default at this time, and both understood that the note was ‘nonrecourse’ and there was no personal liability by the maker of the note. Vergos was aware that Montgomery was still a partner in Waterman and recognized ... the possibility that Montgomery might be breaching his ‘fiduciary duty’ to other partners .... Vergos testified he had a little ‘larceny in his heart,’ but that it was ‘good larceny.’ He admitted recognizing Montgomery’s intent was ill-gotten gain but ‘trusted’ him, thinking there was ‘honesty among thieves.’
“11. On or about September 29, 1988, Vergos and Montgomery closed the purchase of the note with Gilbert. In consideration for assignment of the note and vendor’s lien deed ..., Vergos executed a promissory note ... in the principal amount of $300,000.00 with interest at the rate of 9% per annum to Gilbert. Montgomery had previously guaranteed the obligation of another third person who was proposed as a purchaser of the note (as Montgomery’s alter ego), and this guaranty agreement was modified by Montgomery and Gilbert to provide for Montgomery’s guaranty of Vergos’ $300,000.00 [note] to Gilbert_ The $300,000.00 promissory note was not paid and a default letter was written by Gilbert to Vergos and Montgomery October 30, 1989.... No payment has ever been made by either Vergos or Montgomery on the said promissory note. The Vergos note provided for payment of the cost of collection, including a reasonable attorney’s fee, and waiver of exemption.... The Montgomery guaranty provided for the payment of all expenses incurred in connection with the collection of the promissory note, including reasonable attorney’s fees. The guaranty does not contain a waiver of exemption....
“12. Vergos received from Gilbert an assignment of the $500,000.00 note_ This assignment stated ‘assignor [Gilbert] does hereby warrant unto assignee [Vergos] that said Note is valid and is a binding obligation in accordance with its terms.’
“13. Vergos was represented by an attorney during his negotiations with Montgomery and in his subsequent negotiations with Waterman. Vergos and his attorney obtained the files of Montgomery prior to the assignment of the note from Gilbert to Vergos. These files contained copies of various Partnership documents, including, according to Montgomery, a copy of the promissory note to Gilbert, secured by the vendor’s lien deed, said note being in the final form as executed at the closing, including the word ‘may’ substituted for the word ‘shall.’ After acquiring the note, Ver-gos’ attorney began foreclosure proceedings on the promissory note. No demand or default letter was sent by Vergos or his attorney to the Partnership.
“Upon learning of the scheduled foreclosure, Waterman contacted Vergos and his attorney to try to negotiate some solution. Meetings were held in December 1988, and January 1989, between Vergos, his attorney, representatives of Waterman, and its attorney.
“14. While Vergos alleged in the complaint he was not aware at the time he agreed to contribute the promissory note to the Partnership that the language in such note read ‘may’ rather than ‘shall,’ both his own testimony in deposition, made a part of the record herein, and the testimony of Montgomery suggest that Vergos either had or could have easily obtained a copy of the original note which he then owned.
“15. An agreement was reached between Waterman and Vergos whereby *387 Vergos would receive a 50% interest in the Partnership in return for contributing the $500,000.00 promissory note and vendor’s lien to the Partnership. As additional consideration for the contribution of this note and vendor’s lien by Vergos, other partners agreed to lend the Partnership approximately $70,000.00 to pay delinquent property taxes and attorneys’ fees due Chase under the first mortgage. These funds were to be used by Waterman to cure an existing default under the Chase mortgage and avoid foreclosure of that mortgage.
“16. On January 26, 1989, a letter agreement was submitted by Waterman to Vergos embodying their agreement for Vergos to become a partner in return for his contribution of the promissory note and vendor’s lien. Vergos accepted this written proposal on January 30, 1989. The written letter agreement executed by Vergos on January 30, 1989, contemplated that formal documentation would be subsequently prepared, including an assignment of the vendor’s lien and note, and an amended Partnership Agreement....
“17. From January 30, 1989, through August 16, 1990, Waterman and Vergos considered themselves partners and acted as partners. Vergos held himself out to third parties as a partner, participated in the management of the Partnership, was provided privileged and confidential Partnership information by the other partners, was treated as a partner and considered to be a partner by the other members of the Partnership, and made capital contributions to cover losses by the Partnership.
“18. In reliance on the January 30, 1989, agreement, Messrs. Gottlieb and Dubofsky, two of the Waterman partners, loaned approximately $70,000.00 to cure default in the Chase mortgage. Further, the Partnership’s accountant listed Mr. Vergos as a 50% partner in the 1989 and 1990 federal and state tax returns, prepared K-l’s for Mr. Vergos reflecting his share of the Partnership loss for those tax years, and entered the $500,000.00 note as Vergos’ capital contribution in the Partnership’s accounting records_ The loss allocated to Ver-gos amounted to over $100,000.00 in 1989 and over $40,000.00 in 1990.
“19. Several months after the execution of the January 30, 1989, agreement, an Amended Partnership Agreement ... was prepared and circulated by Waterman’s counsel. On or about May 5,1989, Vergos signed the Amended Partnership Agreement, and soon thereafter other partners holding in excess of 97% of the Partnership’s remaining interests executed the Amended Partnership Agreement. Two minority partners, each holding [an] approximately 1.4% Partnership interest, did not execute the Amended Partnership Agreement. However, the undisputed evidence was that they consented to Mr. Vergos’ admission as a partner. Mr. Du-bofsky testified that he obtained this consent before submitting the January 26, 1989, letter agreement to Vergos. The minority partners’ reasons for not executing the Amended Partnership Agreement had nothing to do with the admission of Vergos as a partner.
“20. In December 1989, Vergos entered into an agreement with Waterman giving Vergos rights to purchase the Building. The agreement recited that Vergos was a general partner, and Ver-gos executed the agreement both individually and as a partner in Waterman.... Both Vergos and Waterman acted upon this agreement, attempting to get financing so Vergos could purchase the Building.
“21. While Vergos testified that he requested a fully executed Partnership Agreement numerous times during the period from May 1989, through August 1990, it was not until August 16, 1990, that Vergos raised this matter in writing, at which time Mr. Vergos, through his attorney, informed the Partnership that he was rescinding his agreement to become a partner.”
I.
In Gaston v. Ames, 514 So.2d 877, 878 (Ala.1987), we stated:
*388 “Where evidence is presented to the trial court ore terms, a presumption of correctness exists as to the court’s conclusions on issues of facts; its determination will not be disturbed unless clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. Cougar Mining Co. v. Mineral Land & Mining Consultants, Inc., 392 So.2d 1177 (Ala.1981). However, when the trial court improperly applies the law to the facts, no presumption of correctness exists. Smith v. Style Advertising, Inc., 470 So.2d 1194 (Ala.1985); League v. McDonald, 355 So.2d 695 (Ala.1978).”
The Alabama Partnership Act provides, in relevant part:
“The rights and duties of the partners in relation to the partnership shall be determined, except as modified by the partnership agreement between them, by the following rules:
[[Image here]]
“(7) No person can become a member of a partnership without the consent of all the partners.”
Ala.Code 1975, § 10-8-43. Article III, § P, of the July 3, 1986, Waterman partnership agreement provides, “No variation hereof shall be deemed valid unless in writing and signed by all the Partners.”
The trial court found that the evidence was undisputed that all of the partners consented to the admission of Vergos as a member of the Partnership.[2] However, the evidence is also undisputed that Messrs. Buslik and Blumenfeld executed neither the January 26, 1989, letter agreement[3] nor the May 5, 1989, amended partnership agreement.
We conclude that the admission of Vergos as a 50 percent partner would constitute a “variation” of the July 3, 1986, partnership agreement, within the meaning of Article III, § P, of that instrument. Because neither the January letter agreement nor the May amended partnership agreement was signed by all of the partners, neither met the requirements set out in the 1986 partnership agreement. The trial court concluded that the provision of the 1986 partnership agreement requiring a writing signed by all of the partners in order to amend the agreement was only for the protection of the parties to that agreement and not Vergos. We disagree. While this provision was obviously for the primary benefit of the existing partners, Vergos was also entitled to have the partners comply with their established procedure. Absent a writing signed by all of the partners, the variations in the 1986 partnership agreement contemplated in the January letter agreement and the May amended partnership agreement are not valid as against the Partnership. For example, the Partnership would not be bound by the provision in the January letter agreement that the property could not be sold without Vergos’s consent. Consequently, neither the January letter agreement nor the May amended partnership agreement is effective to make Vergos a member of the Partnership.[4]
Having found that “[subsequent to the execution of the January 30 [sic], 1989 Partnership Agreement, Vergos considered himself a partner, acted like a partner, held himself out to others as a partner, and was considered to be and was treated as a partner by Waterman,” the trial court held that Vergos is “estopped to assert the invalidity of his agreement based upon the lack of a fully executed amended Partnership Agreement.” In support of this conclusion, the trial judge cited three decisions of this Court. In Draughon v. General Finance Credit Corp., 362 So.2d 880, 884 (Ala.1978), we stated:
*389 “The purpose of equitable estoppel is to promote equity and justice in an individual case by preventing a party from asserting rights under a general rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience. Mazer v. Jackson Insurance Agency, 340 So.2d 770 (Ala.1976); First National Bank of Opp v. Boles, 231 Ala. 473, 479, 165 So. 586[, 592] (1936).”
The Court then went on to hold that, because of his conduct, the plaintiff could not assert the doctrine of estoppel in that case. In Mazer, cited in Draughon, supra, the Court set out at length the elements of promissory and equitable estoppel; and in Goza v. Johnson, 587 So.2d 998 (Ala.1991), we held that a lessee was estopped from asserting the Statute of Frauds in an action to enforce an oral oil and gas lease.
In none of those cases was estoppel applied to allow one party to avoid the consequences of its failure to comply with its own established procedures. In the present case, all of the members of Waterman agreed in the 1986 agreement that no variation of the agreement would be valid unless it was in writing and signed by all of the partners. Vergos’s actions notwithstanding, there never was a writing signed by all of the partners agreeing to the admission of Vergos as a partner or agreeing ■ to make certain changes in the partnership to his benefit. The present case does not involve a person seeking protection under a “general rule of law” or under a legal technicality. Rather, Waterman would have us apply the doctrine of estoppel as a means of permitting the partnership and its members to avoid the specific requirements established in the 1986 partnership agreement.
In order for estoppel to apply, the truth of the allegedly misrepresented fact must have been unknown to the party asserting estoppel at the time that he acted upon the alleged misrepresentation. Mazer, 340 So.2d at 773; citing 3 Pomeroy, Equity Jurisprudence § 805 (5th ed. 1941).
“A party invoking estoppel must have in good faith been ignorant of the true facts at the time a representation is made to him, and must have acted with diligence to learn the truth. Patillo v. Tucker, 216 Ala. 572, 113 So. 1 [ (1927)]. Estoppel cannot exist where knowledge of both parties is equal, and nothing is done by one to mislead the other. King v. Langham, 272 Ala. 662, 133 So.2d 669 [(1961)].”
Ivey v. Dixon Investment Co., 283 Ala. 590, 594, 219 So.2d 639, 643 (1969).
In the present case, the members of the partnership knew that the 1986 partnership agreement required a writing signed by all of the partners in order for a variation in that agreement to be effective. They further knew that neither the January 1989 letter agreement nor the May 1989 amended partnership agreement was signed by all of the partners. In fact, the partners knew this before Vergos did. Accordingly, we find that Vergos did not act in such a way that the partners could have reasonably believed that a partnership had been formed between them and Vergos.
Ala.Code 1975, § 10-8-55, addresses the liability of a partner by estoppel. That section sets out the conditions under which the representations of an alleged partner or partnership to a third party may give rise to liability to that third party. There is no language in that section that could provide a legal basis for a finding of partnership by estoppel when the dispute is among the alleged partners.
The courts of some states have held that, “[a]s between the parties themselves, there may exist an estoppel to allege or deny a partnership relation.” 68 C.J.S. Partnership § 21 (1950); see also, cases cited in nn. 17-20 therein. This Court has not adopted that position. In Waters v. Union Bank of Repton, 370 So.2d 957, 960 (Ala.1979), we held that a partnership “is never established by implication or operation of law, at least in the situation where the dispute concerning the existence of a partnership is between the parties.” Therefore, we conclude that the trial court erred in holding that Vergos is estopped to assert the invalidity of the January 1989 letter agreement.
*390 The full record before us and the findings of the trial court lead us to conclude that Vergos had never been, and is not now, a member of the Waterman Building Partnership. We further hold that the trial court erred in enforcing the January 1989 letter agreement and ordering Vergos to transfer the promissory note and vendor’s lien deed to Waterman.
II.
Vergos further asserts that the trial court erred in finding that the $500,000 promissory note from Waterman to Gilbert is a nonrecourse note. Specifically, Vergos argues that the trial court erred in holding, as a matter of law, that the promissory note was ambiguous. The relevant portion of the promissory note provides:
“Upon the occurrence of an event of a default as specified elsewhere herein, or in the Vendor’s Lien Deed, the Lender may take possession of the real property together with any improvements thereon, and the Borrower shall be released from any further obligation or liability pursuant to this Note.”
Without any reference to extrinsic evidence, it is clear to us that by its terms this provision is subject to at least two reasonable interpretations. That is, it could be interpreted as a partial nonrecourse provision, as Vergos asserts; or it could be interpreted as an absolute nonrecourse provision, as the trial court concluded. Accordingly, we hold that the trial court correctly held that the provision was ambiguous. Because Vergos does not challenge the trial court’s finding of fact with regard to this provision, we affirm that part of the trial court’s judgment holding that the $500,000 promissory note is a nonrecourse note.
CONCLUSION
The judgment of the trial court is affirmed with regard to the interpretation of the promissory note. That part of the judgment wherein the trial court held that Vergos is a member of the Waterman Building Partnership and wherein it also ordered Vergos to transfer the promissory note and vendor’s lien deed to Waterman is reversed. The case is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and ADAMS, HOUSTON and STEAGALL, JJ., concur.

. It appears from the record that Vergos’s reasons for seeking this declaratory judgment are two-fold. First, Vergos believed that a valid partnership agreement had not been executed, and he was, therefore, uncertain about his rights and responsibilities vis-á-vis the partnership. Second, he was obviously dissatisfied with the financial condition of the partnership.

. Vergos disputes this finding, but because of our resolution of this issue, it is not necessary to address that dispute.

. The January 26, 1989, letter agreement was executed only by Dubofsky, Gottlieb, and Ver-gos.

.Vergos also challenges the trial court’s conclusion that the January 29, 1989, letter agreement is sufficiently definite in its terms to be subject to specific enforcement. Because we hold that the agreement is wholly ineffective, we decline to address that issue.