Brant Steele appeals from a declaratory judgment in favor of Rosenfeld, LLC, and Lance Elkins in an action by Elkins and Rosenfeld, LLC, to determine the ownership interest, if any, of various parties in Rosenfeld, LLC. We affirm.
 I. Factual Background
The events underlying this dispute began in October 1998. At that time, Elkins owned a three-story building in Tuscaloosa, known as the "Rosenfeld building." An ongoing business, known as the AESCO Superstore ("the Superstore"), which Elkins operated as R T Enterprises, Inc., occupied the first floor. Steele offered to "buy," and Elkins agreed to "sell," the third floor of the Rosenfeld building for $70,000. Elkins and Steele agreed to an initial payment of $20,000, with the remaining $50,000 to be paid in annual installments, beginning January 1, 2000. On November 23, 1998, Steele paid Elkins $20,000 and took possession of the third floor. No documents evidencing these transactions were executed.
Approximately one month later, Elkins received from Chris Glover an offer to "buy" the second floor of the Rosenfeld building for $40,000. Elkins accepted that offer, and Glover paid him $40,000 in cash. Shortly thereafter, Glover expressed concern about the legality or enforceability of his "purchase," and Elkins and he sought the advice of legal counsel. According to the final order of the trial court in this case, counsel advised Elkins and Glover "that what they proposed was legally impossible without a condominium declaration." (Emphasis added.) Subsequently, according to the trial court,
 "[a]fter further investigation, it was determined to be unfeasible to have the building made a condominium. [Counsel] suggested that [Rosenfeld, LLC,] be formed that would hold title to the building with Elkins, Glover, and Steele owning shares of the LLC. The LLC was formed on January 15, 1999, with Elkins owning 66.67% of the [membership] and Chris Glover owning 33.33% of the [membership]. Title to the building was transferred to Rosenfeld LLC.
 "Rosenfeld LLC leased the first floor to the plaintiff Elkins [d/b/a the Super-store], and the second floor to Chris Glover. Brant Steele did not sign a lease for the third floor, but continued to occupy the third floor. Plaintiff Elkins presented defendant Steele with a promissory note for the purchase of a 1/3 interest in Rosenfeld LLC. Defendant Steele never signed the promissory note."
(Emphasis added.)
Pursuant to the "Articles of Organization of Rosenfeld, LLC" ("the articles"), and the "Operating Agreement of Rosenfeld, LLC" ("the operating agreement"), Elkins served as manager of Rosenfeld, LLC (hereinafter referred to as "Rosenfeld"). From November 23, 1998, through *Page 490 
March 26, 2001, Steele paid Elkins $37,775.20 of the $70,000 due under their oral arrangement for Steele to purchase the third floor of the Rosenfeld building, and, according to Steele, on a "couple of occasions," he gave Elkins personal checks "for the payment of taxes or insurance or other expenses of maintaining [Rosenfeld's] business." However, Steele's name does not appear in the articles or in the operating agreement.
The Rosenfeld building was destroyed by fire on July 16, 2001. At the time of the fire, there were in force two insurance policies covering the building. Rosenfeld was the named insured under a policy issued by Nationwide Mutual Fire Insurance Company ("Nationwide") for $960,000. The Superstore was the named insured under a policy issued by Great River Insurance Company ("Great River") for $1,000,000. The lease between the Superstore and Rosenfeld provided that "in the case of insurance against damage to the demised premises by fire," the "loss, if any, [would] be adjusted with and . . . payable to [Rosenfeld]."
On December 21, 2001, Nationwide issued a check payable to Rosenfeld for $300,000. At approximately that same time, Great River issued a check payable to, among others, the Superstore and Rosenfeld for $300,000. Great River subsequently issued a second check in the amount of $27,500. These payments were for the purported actual cash value of the Rosenfeld building. On December 30, 2001, Glover died, and his father, Fred M. Glover, Jr., was appointed administrator of Glover's estate (hereinafter "the Glover estate"). On March 21, 2002, the First Baptist Church of Tuscaloosa purchased the Rosenfeld building. Rosenfeld netted approximately $116,000 from that transaction.
Steele made no payments under his oral arrangement with Elkins after the fire. After Glover's death, however, discussions began between Elkins and Steele regarding the disposition of the moneys received for the Rosenfeld building and the future of Rosenfeld. The discussions focused on two options. In one option, Elkins contemplated purchasing a new building and Rosenfeld would continue to exist as a limited liability company. That option, in substance, would have required Steele to "buy in" to Rosenfeld by contributing toward the purchase price of the new building, in addition to paying the amount he still owed under his oral arrangement with Elkins. In the second option, Elkins proposed, in substance, to "buy out" Steele's interest in Rosenfeld for the difference between a portion of the proceeds of the insurance and the sale of the Rosenfeld building, and the amount Steele still owed under his oral arrangement with Elkins.
Steele did not agree to either option, and, on April 3, 2003, Elkins and Rosenfeld filed this declaratory-judgment action seeking to determine Elkins's, the Glover estate's, and Steele's interests in Rosenfeld. The complaint averred that Elkins, Steele, and the Glover estate claim some interest in Rosenfeld, and sought a determination of (1) the "percentage of ownership interest in [Rosenfeld]" possessed by Elkins, Steele, and the Glover estate, and (2) the "appropriate disbursement amounts, if any," of the moneys resulting from the insurance payouts and the sale of the Rosenfeld building to which Elkins, Steele, and the Glover estate are entitled. Steele and the Glover estate filed counterclaims, averring, among other things, that Elkins was concealing the receipt of $650,000 in insurance proceeds from Great River, and, consequently, that he had converted "hundreds of thousands of dollars representing the proceeds paid to Rosenfeld under the policies of insurance issued *Page 491 
by Nationwide and Great River." The counterclaims alleged conversion and breach of fiduciary duty, and requested legal and equitable relief.
The trial of the case was bifurcated, with the complaint for a declaratory judgment, namely, the issues regarding the ownership interests in Rosenfeld, tried first on the basis of evidence presented ore tenus. The trial court entered an interlocutory order, declaring that Steele possessed no interest in Rosenfeld, and, therefore, that he was entitled only to reimbursement of the money he had paid pursuant to his oral agreement with Elkins to purchase the third floor of the Rosenfeld building. The order further declared that the Glover estate possessed a one-third interest in Rosenfeld and that it was "entitled to 1/3 of any monies that are ultimately determined to be assets of Rosenfeld." Steele filed a motion to alter, amend, or vacate the order. The trial court denied that motion and certified the interlocutory order as a final judgment, pursuant to Ala. R. Civ. P. 54(b). Steele appealed.[1]
 II.Issues and Arguments
Steele argues for a reversal of the order on three grounds. First, he contends that he has valid contractual rights to a portion of the proceeds from the insurance policies and the sale of the Rosenfeld building. Second, he argues that he is entitled to some of the proceeds under the doctrine of equitable conversion. Third, he insists that he is entitled to a share of the proceeds based upon a theory of equitable estoppel.
 A. Contractual-Rights Theory
Steele contends that the oral agreement between Elkins and him constituted an executory contract for the purchase of a one-third membership interest in Rosenfeld, to be fully performed upon payment in full of the agreed-upon price for the third floor of the building. Furthermore, Steele insists that Elkins and he reached an oral agreement after the fire, that is, a second oral agreement, to the effect that "the balance of the purchase price due Elkins [from Steele under the original oral agreement] would be paid from `Steele'sshare' of the insurance proceeds." Steele's brief, at 38 (emphasis added; footnote omitted). Under the second oral agreement, according to Steele, "Steele's purchase price waspaid in full" as soon as Elkins received Nationwide's check, which was issued on December 21, 2001, and at that point Steele was entitled to full membership in Rosenfeld and a right to a portion of the remaining insurance proceeds and the proceeds from the sale of the Rosenfeld building. Steele's brief, at 38 (emphasis added). Thus, he contends that the executory contract has been fully performed and that he is entitled to a share of the proceeds.
In the alternative, Steele contends that he need not be a "full member" of Rosenfeld, as "member" is defined in the Alabama Limited Liability Company Act, Ala. Code 1975, §10-12-1 et seq. ("the Act"), to acquire a right to a "one-third distribution of the insurance proceeds." Steele's brief, at 37. Ala. Code 1975, § 10-12-2(j) defines a "member" as "[a] person reflected in the required records of a limited liability company as the owner of some governancerights of a membership interest in the limited liability company." (Emphasis added.) Steele does not assert that he ever had any "governance," i.e., voting, rights in Rosenfeld before Rosenfeld received the insurance proceeds. Instead, he argues that the rights of membership in an Alabama limited liability company may *Page 492 
essentially be bifurcated into "financial rights" and "full membership (i.e., governance) rights." Steele's brief, at 33.
Under this theory, according to Steele, "a [full] member assigns his [financial] interest to another party, which party is not made a substituted member until completing the formalities of the Operating Agreement and Act, but [who] does obtain the financial rights of the transferor, who retains formal membership, and thus, voting rights." Id. In this manner, Steele insists, he "obtained financial rights when [Rosenfeld] was formed, and had contracted, once his payments to Elkins were complete, to obtain full membership (i.e., governance) rights as well." Id. Thus, he contends, in essence, that his initial affiliation with Rosenfeld involved two independent contracts: the first being fully executed for the transfer of financial rights; the second being executory for the eventual transfer of voting rights.[2]
He argues that the declaratory judgment must be reversed, based on the trial court's failure to find the existence of a fully executed enforceable contract.
Elkins contends, however, that his oral agreement with Steele, standing alone, is "insufficient, under [the Act] and under the terms of the governing [instruments] of [Rosenfeld], to give Steele [an interest] in [Rosenfeld]." Elkins's brief, at 24. In that connection, Ala. Code 1975, § 10-12-33, provides, in pertinent part:
 "(a) Except as otherwise provided in the operating agreement:
 "(1) An assignee of an interest in a limited liability company may become a member only if the other members unanimously consent. The consent of a member may be evidenced in any manner specified in the operating agreement, but in the absence of such a specification, consent shall be evidenced by a written instrument, dated and signed by the member."
(Emphasis added.) Article VI of the articles states: "Additional members may be admitted but only upon the unanimous written consent of the then existing members." (Emphasis added.) Similarly, § 9.1(B) of the operating agreement prohibits the admission of additional members "without the prior written consent of Members holding at least seventy-five (75%) of the membership interests (other than the Member who is the transferor of such transferee)." (Emphasis added.)[3]
It is undisputed that there is no writing purporting to constitute the assent of Glover, who, the trial court found, owned one third of Rosenfeld. Elkins argues that the fact "that no . . . written [approval of the purported] assignment was ever executed is fatal to [Steele's] attempt to claim any *Page 493 
benefits of membership in [Rosenfeld]." Elkins's brief, at 33 (emphasis added). We agree.
The clear and unambiguous provisions of the Act, the articles, and the operating agreement require the written consent
of Glover to Steele's becoming a member of Rosenfeld. Section 9.3 of the operating agreement states: "Transfers in violation of the provisions of this Article shall be null and void andof no effect for any purpose." (Emphasis added.) Assuming, without deciding, the legal validity of bifurcating the rights of membership as Steele advocates, Steele does not explain how — in the absence of compliance with the provisions for transfers — the purported assignment of the whole orany part of a "package" of interests is effective.
Steele says only that the parties' failure to comply with the requirements "cannot now be used by [Elkins] to his advantage and Steele's detriment." Steele's brief, at 36. However, he cites no authority in his principal brief for the proposition that this Court can ignore non-compliance with those requirements. Authority for this argument appears for the first time in Steele's reply brief. "The law of Alabama provides that where no legal authority is cited or argued, the effect is the same as if no argument had been made." Bennettv. Bennett, 506 So.2d 1021, 1023 (Ala.Civ.App. 1987) (emphasis added). "[A]n argument may not be raised, nor may an argument be supported by citations to authority, for the first time in an appellant's reply brief." Improved Benevolent Protective Order of Elks v. Moss, 855 So.2d 1107,1111 (Ala.Civ.App. 2003), abrogated on other grounds, Exparte Full Circle Distribution, L.L.C., 883 So.2d 638
(Ala. 2003). Where an appellant first cites authority for an argument in his reply brief, it is as if the argument was first raised in that reply brief, and it will not be considered.[4] For these reasons, Steele has failed to demonstrate that he has a contractual right to a portion of the proceeds.
 B. Equitable-Conversion Theory
Next, Steele argues that he is "entitled to one-third of . . . the insurance proceeds under the theory of equitable conversion, because the LLC interest was effectively destroyed during the time in which Steele's contract for purchase of the interest was executory." Steele's brief, at 52 (emphasis added). We disagree with the application of the doctrine of equitable conversion to the transfer of an interest in a limited liability company.
"An interest in a limited liability company ispersonal property." Ala. Code 1975, § 10-12-6
(emphasis added). "However, this doctrine of equitable conversion is applicable only when there is a specificallyenforceable contract between the parties, and the changes in the rights, duties, powers, and liabilities of the parties that result from the making of the contract are consequences of the equitable right to specific performance," Roberts v.Adams, 47 P.3d 690, 695 (Colo.Ct.App. 2001) (emphasis added), in contracts for the sale of real estate. See also Passey v. Great Western Assocs. II,174 Ariz. 420, 427, 850 P.2d 133, 140 (Ariz.Ct.App. 1993) ("the doctrine [of equitable conversion] applies only to real estate contracts that are capable of being specifically performed"); Peoplev. Alexander, 663 P.2d 1024,1030 n. 6 (Colo. 1983); IIIAmerican Law of Property § 11.22, at 62-63 (1952). Because this case involves the purported transfer of an interest in personalty, i.e., an interest in Rosenfeld, *Page 494 
Steele's equitable-conversion argument has no merit.
In an apparent attempt to circumvent the consequences of this rule that the doctrine of equitable conversion applies only to real-estate contracts capable of specific performance, Steele urged the trial court — for the first time in his posttrial motion to alter, amend, or vacate the judgment — to "pierce the veil" of Rosenfeld, and regard the purported transfer of an interest in Rosenfeld as, in fact, a contract for the sale of real estate. Specifically, Steele argued:
 "The operations of [Rosenfeld] are such as to justify the court's disregard of the entity, piercing the veil and treating Elkins, Glover, and Steele as one-third owners of the [Rosenfeld] building. Thus, Steele would have an executory contract for the purchase of his interest in the building and would be entitled to a 1/3 share of the insurance proceeds under the doctrine of equitable conversion."
(Emphasis added.) In its order overruling the posttrial motion, the trial court expressly declined to consider the issue of piercing the corporate veil.
It is well settled that "a trial court has the discretion to consider a new legal argument in a post-judgment motion, but is not required to do so," and that "[w]e will reverse only if the trial court abuses that discretion." Green Tree Acceptance,Inc. v. Blalock, 525 So.2d 1366, 1369-70 (Ala. 1988). See also Diamond v. Aronov, 621 So.2d 263, 266-67
(Ala. 1993); Blackmon v. King Metals Co., 553 So.2d 105,106 (Ala. 1989); D.J. Sherwood Transp., Inc. v. Road Shows,Inc., 656 So.2d 884, 887 (Ala.Civ.App. 1995). The trial court did not exceed its discretion in declining to consider this argument.
 C. Equitable-Estoppel Theory
Finally, Steele contends that Elkins should be "estopped todeny Steele's status as a member, or, alternatively, from withholding consent to Steele's becoming a member" of Rosenfeld. Steele's brief, at 41 (emphasis added). More specifically, he argues:
 "By presenting Steele with his LLC `package' Elkins, in effect, made the representation to Steele that by performing the terms of the promissory note and agreement to purchase, Steele would become a full member of [Rosenfeld]. Relying on this representation, Steele, who had already contributed $20,000 in the form of a down payment, began making, and Elkins continued accepting, the installment payments required under the note and agreement as well as the . . . payments for taxes and insurance. Steele was also allowed to remain in possession of the third floor of the Rosenfeld Building. . . . According to the arrangement between Elkins and Steele, once the insurance proceeds were paid to Elkins, Steele's obligation to him under the note was completely satisfied. [Elkins] cannot now be allowed to deny the validity of the agreement, or alternatively, to withhold [his] consent.
 "In fact, there was ample evidence before the trial court indicating that both Elkins and Glover knew of and consented to Steele being a member of Rosenfeld, LLC."
Steele's brief, at 47-48.
Elkins, however, contends that to afford Steele membership status in Rosenfeld "in the complete absence of any of the formal requisites imposed by statute or Operating Agreement" for the addition of a member would impermissibly afford him "membership by estoppel." Elkins's brief, at 42-43. We agree with Elkins. *Page 495 
In Vergos v. Waterman Building Partnership,613 So.2d 383, 389 (Ala. 1993), this Court said:
 "The courts of some states have held that, `[a]s between the parties themselves, there may exist an estoppel to allege or deny a partnership relation.' 68 C.J.S. Partnership § 21 (1950). . . . This Court has not adopted that position. In Waters v. Union Bank of Repton, 370 So.2d 957, 960 (Ala. 1979), we held that a partnership `is never established by implication or operation of law, at least in the situation where the dispute concerning the existence of a partnership is between the parties.'"
(Emphasis added.) On that basis, this Court refused to entertain an estoppel theory asserted by a seven-member partnership to prevent the dissociation of the signatory of a "letter agreement" purporting to make the signatory a member, where two of the members had not assented in writing as required by the "partnership agreement," notwithstanding that the signatory had "`held himself out to third parties as a partner, participated in the management of the Partnership, was provided privileged and confidential Partnership information by the other partners, was treated as a partner and considered to be a partner by the other members of the Partnership.'"613 So.2d at 387. Otherwise stated, among the parties to a partnership, membership cannot be acquired by estoppel.
The provisions pertinent to this case are fully consistent with this rule, and we see no reason to apply a different rule in the context of a limited liability company. See Ala. Code 1975, § 10-12-8(a) (providing that, for statutory purposes, limited liability companies are generally treated as partnerships).
Under § 10-12-33(a)(1), membership accretion must be "evidenced by a written instrument, dated and signed" by all the existing members. (Emphasis added.) Likewise, the articles condition the admission of additional members "upon the unanimous written consent of the then existing members." Art. VI (emphasis added). We will not disregard the plain meaning of these provisions in order to afford Steele membership in Rosenfeld on the basis of implied representations and the purported acquiescence of Glover and Elkins in certain actions by Steele.
 III. Conclusion
For the foregoing reasons, Steele has failed to demonstrate that the trial court erred in overruling his post-judgment motion. Therefore, the order of the trial court declaring that Steele possessed no interest in Rosenfeld is affirmed.
AFFIRMED.
NABERS, C.J., and LYONS, SMITH, and PARKER, JJ., concur.
[1] This appeal involves no issue regarding the interest of the Glover estate in Rosenfeld or the claims of the Glover estate against Rosenfeld and Elkins.
[2] Although Steele asserts that this is a question of first impression in Alabama, he cites no caselaw fromany jurisdiction in support of his argument that membership rights in a limited liability company may be so bifurcated.
 "Rule 28(a)(10), Ala. R.App. P., requires the appellant to cite relevant authority in support of its arguments. This is so, because `"it is neither our duty nor function to perform all the legal research for an appellant."' Henderson v. Alabama A M Univ., 483 So.2d 392, 392 (Ala. 1986) (quoting Gibson v. Nix, 460 So.2d 1346, 1347
(Ala.Civ.App. 1984))."
Beachcroft Props., LLP v. City of Alabaster,901 So.2d 703, 708 (Ala. 2004) (emphasis added).
[3] Also, the articles state: "Upon the death . . . of a member in the Company, the business of [Rosenfeld] shall notbe continued and [Rosenfeld] shall be dissolved unless there is obtained the written consent of all the remaining members of [Rosenfeld] . . . and there are at least two remaining members." (Emphasis added.) Steele does not claim that he became a member after the death of Glover.
[4] At any rate, the two cases Steele cites in his reply brief merely stand for broad, general principles of law and have no specific application to this case.